

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:22-CR-152 |
| PHILLIP WINDOM OFFILL, JR., | |
| Defendant. | |

## STATEMENT OF FACTS

The United States and the defendant, PHILLIP WINDOM OFFILL, JR. (hereinafter, "the defendant"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1.     From at least approximately in or around November 2016 through at least in or around October 2018, in the Eastern District of Virginia and elsewhere, the defendant did knowingly and intentionally combine, conspire, and agree with Co-defendant Justin Wallace Herman, Co-Conspirator #1 ("CC-1"), and others, to commit securities fraud (18 U.S.C. § 1348) and wire fraud (18 U.S.C. § 1343), all in violation of 18 U.S.C. § 1349.

2.     The defendant helped facilitate an asset acquisition between Armada Mining, a privately-held Nevada corporation headquartered in Montana, and MCPI, a publicly traded "shell" company with virtually no operations and low-value common stock (penny stock) registered with the SEC.   Individual 1 was the majority owner and control person of the MCPI "shell" company.   Individual 2 was the Chief Executive Officer of Armada Mining and MCPI under its new name Mansfield-Martin Exploration Mining, Inc. ("Mansfield").   Mansfield was incorporated in Nevada and headquartered in Tombstone, Arizona.   It held mining claims in Arizona and Idaho but was not actively engaged in mining operations and needed to raise money

1

to fund future operations.  Mansfield's stock traded on Over The Counter ("OTC") Markets under the stock ticker MCPI.

3.      In order for Mansfield to trade its penny stock on the OTC Market under its new name and the ticker MCPI, it first had to submit a request for a corporate name change to the Financial Industry Regulatory Agency ("FINRA").

4.      On or about February 28, 2017, the defendant falsely identified himself as "Paul James Jimerson" and submitted a company action notification to notify FINRA of the MCPI corporate name change.   The defendant adopted and used the false alias "Jim Jimerson" (or variations of that name) in order to conceal his true identity from FINRA and other various stock-related businesses and individuals because he had been previously convicted of a felony involving securities fraud and had been banned from participating in the offering and sale of penny stocks by prior judicial orders.

5.      As part of the scheme, the defendant, Herman, and CC-1 provided Mansfield's stock transfer agent and brokerage firms with materially false information, including fraudulent consulting and stock purchase agreements and attorney opinion letters.   The defendant assisted in the preparation of some of the materially false documents.   The defendant knew that stock transfer agents act on the direction of the company issuing shares and issues and cancels stock certificates to reflect changes of ownership and are required to attempt to ensure that the transfer is properly authorized by the transferor.   The defendant knew that information about consulting and stock purchase agreements was important to Mansfield's stock transfer agent and the brokerage firms in justifying the transfer of MCPI shares from Individual 1 to Herman, CC-1, and to entities under their control, and for accepting the shares for sale.

6.      The defendant also came to know and understand that in order to perpetuate the scheme to inflate the value of the MCPI shares, Herman and CC-1 had paid third parties, including call centers, to market MCPI shares for sale to the general public.   They typically paid the third party operators between 35-55% of the sales proceeds.   These third parties solicited investments by calling potential investors nationwide.   Victim investors living in the Eastern District of Virginia purchased MCPI shares marketed by these third parties.   During and in furtherance of the conspiracy, the third-party marketers solicited more than ten (10) victims nationwide who invested in MCPI shares as a result of these mass-marketing efforts.

<u>1.5 Million Share Transfer</u>

7.      In or about January of 2017, and as part of the conspiracy, the defendant helped to arrange the transfer of 1.5 million MCPI shares of stock from Individual 1 to CC-1, and then ultimately to Herman.   These shares were securities within the meaning of 18 U.S.C. § 1348, that is, these shares were securities of an issuer with a class of securities registered under Section 12 of the Securities and Exchange Act of 1934.   As part of the fraudulent scheme, Herman and CC-1 arranged to have these shares transferred to Herman's control because Herman had the ability to "clear" (i.e., deposit and then sell to the public) penny stocks through his brokers.

8.      In furtherance of the scheme, the defendant asked CC-1 to arrange the MCPI stock for sale to the public and others.   CC-1 reported to the defendant that he was unable to clear the shares and would rely on Herman to make such arrangements.   The defendant and CC-1 agreed that Herman would be compensated for clearing the stock after expenses and that Herman would make payments directly to the defendant.   Defendant spoke to Herman regarding the sales and Herman agreed to pay the defendant an advance on the shares.   Herman's payment in connection with the MCPI shares sales were sent from Herman's Intrepid Capital account to

3

an account held in the name of MMM&E Corporation Services ("MMM&E account") at Regions Bank in Dallas, Texas.   The defendant opened this account on January 30, 2017, and was the sole signatory.

9.     On or about January 31, 2017, Herman caused a wire transfer of $10,000 to be sent from his account at Citizens Bank in Rhode Island to the defendant at the MMM&E account at Regions Bank.

10.     On or about February 3, 2017, Herman emailed his broker at Island Capital and directed that the 1.5 million shares of MCPI be sent to his personal account at Huntington National Bank.   In support of this request, Herman attached a fraudulent Stock Purchase Agreement (the "SPA") dated February 2, 2017.   The defendant had previously created this SPA and forwarded a draft to Herman and CC-1 via email on or about that date for their signature.

11.     To make the transfer of the 1.5 million MCPI shares to Herman appear authorized and legitimate to brokers and others, Herman and CC-1 signed the SPA which provided for the purchase by Herman of 1.5 million shares of MCPI at an aggregate purchase price of $.10/share (or $150,000 in total).   The SPA was fraudulent because Herman never intended to pay and did not pay CC-1 $150,000 for the shares but the conspirators needed the fraudulent SPA to justify and legitimize the transfer of MCPI stock to brokers.

12.     In or around February 2017, CC-1 transferred the 1.5 million shares of MCPI stock to Herman.   Once he received the MCPI shares, Herman successfully deposited them into one of his accounts (at a trust company not a broker-dealer) and ultimately sold the shares to public investors for profit.

13.     On or about April 25, 2017, the defendant emailed Herman and asked him to reconcile the MCPI position Herman held and account for the cash and outstanding MCPI

shares.  The defendant wrote: "Your failure (refusal? Inability?) to timely report on stock/cash positions is a concern.  If you've sold it all, we ought to figure out what's owed to whom and return the balance to CC-1 (that's where they came from) so that he/we can figure out what do do.".

<u>15 Million Share Transfer</u>

14.    Beginning in or around April 2017, the defendant facilitated the transfer of an additional 15 million MCPI shares owned by Individual 1 to Herman.

15.    On or about June 28, 2017, the defendant, using his false "Jimerson" alias, emailed Mansfield's transfer agent a fraudulent Transfer Instruction Form that indicated that Individual 1 wished to transfer the 15 million shares of MCPI to Herman in a share sale transaction for consideration of $750,000 (or $.05 per share).  The defendant knew that this Transfer Instruction Form was fraudulent because he knew that Herman had not paid Individual 1 $750,000 in connection with this transfer and had no knowledge that Herman intended to do so. However, the defendant and Herman knew that the form needed to be provided to justify the transaction for the stock transfer agent to execute the transaction.

16.    A day later, in a June 29, 2017, email to the stock transfer agent, the defendant (using the "Jimerson" alias) falsely stated that Individual 1 "sold these share" to Herman and wanted to move them and get paid.  The defendant knew this was false because he was aware that Herman had not paid for these shares and had no knowledge that he intended to do so.

17.    On or about July 11, 2017, Mansfield's stock transfer agent followed the defendant's instructions and processed the transfer of Individual 1's 15 million MCPI shares to Herman's brokerage account. After depositing the fraudulently obtained shares into his brokerage account, Herman sold these shares to the public using third parties.

18.     Over the next several months, Herman realized proceeds of at least $1.2 million from the sale of MCPI shares.   Herman did not purchase or pay Individual 1 for any of the 15 million MCPI shares that were transferred into his brokerage account.   Herman did remit proceeds from the sale of MCPI to the defendant and into financial accounts designated by the defendant or by other co-conspirators.   Herman also personally profited from the sale of the MCPI shares after paying for expenses, such as the call centers.

19.     On or about February 21, 2018, the defendant knowingly caused a materially false press release about MCPI to be issued in an attempt to fraudulently increase demand for MCPI stock.   The press release stated in part that Mansfield had entered into an agreement with Westgrove Partners LLC to receive up to $3 million in funding to construct processing facilities on company-owned property.   The defendant knew that at the time this press release was issued there was no written or signed agreement with Westgrove Partners, an entity over which the defendant maintained control. The defendant also knew that Westgrove never received any financing for these purposes.

20.     On or about March 20, 2018, the defendant knowingly caused Mansfield to issue a materially false press release stating, in part, that Westgrove Partners would be providing funding for Mansfield to make property purchases and claims.   The defendant knew that at the time this press release was issued there was no written or signed agreement with Westgrove Partners, an entity over which the defendant maintained control. The defendant also knew that Westgrove never received any financing for these purposes.

21.     During the conspiracy, and in total, the co-conspirators jointly generated more than $1.3 million in proceeds from the sales of MCPI shares, of which approximately $386,000 was distributed to the defendant.

Additional Relevant Information

22.     Prior to and during the scheme to sell MCPI shares to the public, the defendant

engaged in similar conduct in connection with the sale of shares of other penny stocks, including

a stock that traded under the stock ticker PGAS, among others.

23.     The defendant was previously employed as an attorney for the U.S. Securities and

Exchange Commission ("SEC") and was an experienced practitioner in the field of securities

law.   His license to practice law was revoked by the state bars of Texas and Oklahoma prior to

his involvement in this offense.   While the defendant was participating in this conspiracy, the

defendant was serving a term of 3 years of supervised release following his 2010 conviction in

this District for wire fraud and conspiracy to commit securities fraud and wire fraud in

connection with the fraudulent sale of different penny stocks.

Conclusion

This statement of facts includes those facts necessary to support the plea agreement

between the defendant and the United States.   It does not include each and every fact known to

the defendant or to the United States, and it is not intended to be a full enumeration of all of the

facts surrounding the defendant's case.

The actions of the defendant, as recounted above, were in all respects knowing and

deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:   *Kimberly R. Pedersen*
      Kimberly R. Pedersen
      Assistant United States Attorney

7

GLENN S. LEON

Chief, Fraud Section, Criminal Division
U.S. Department of Justice

By: _____

Andrew R. Tyler
Amanda F. Lingwood
Trial Attorneys
Bond Building

Date: _March 13, 2023_

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, PHILLIP W. OFFILL, JR., and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____

PHILLIP W. OFFILL, JR.,

I am the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____

Nathaniel Westrup
Joseph Walker
Attorneys for PHILLIP W. OFFILL, JR.,

8